# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 13, 2003 Session

## STATE OF TENNESSEE v. VIDAL L. STRICKLAND

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-705    J. Randall Wyatt, Jr., Judge**

---

**No. M2002-01714-CCA-R3-CD - Filed September 30, 2003**

---

The defendant, Vidal L. Strickland, was convicted by a Davidson County Criminal Court jury of aggravated robbery, a Class B felony; attempted aggravated robbery, a Class C felony; and felony possession of a weapon, a Class E felony.  He was sentenced as a Range I, standard offender by the trial court to ten years for the aggravated robbery conviction, four years for the attempted aggravated robbery conviction, and two years for the felony possession of a weapon conviction, with the robbery sentences ordered to be served consecutively, for an effective sentence of fourteen years in the Department of Correction.  Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court, arguing:  (1) the evidence was insufficient to support his robbery convictions; (2) the trial court erred in denying his motion to suppress the results of the victims' pretrial identifications; (3)  the trial court erred in ordering consecutive sentencing; and (4) the trial court erred in granting the State's motion in limine to suppress the defendant's statements to law enforcement officers.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

James Robin McKinney, Jr., Nashville, Tennessee, for the appellant, Vidal L. Strickland.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon L. Brox and Philip H. Wehby, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The record in this case establishes that shortly before 8:00 p.m. on November 27, 2000, Blair Keso, Bridget Landtroop, and Erin Sumrall were accosted in the parking lot of the Broadcast Music,

Incorporated ("BMI") Building in Nashville by two men, one of whom brandished two handguns and demanded their money and purses. After the gunman had taken Sumrall's purse, both men fled together on foot, and the victims called 9-1-1. Twenty to thirty minutes later, police officers canvassing the area spotted the twenty-eight-year-old defendant and his eighteen-year-old codefendant, Richard L. Winfrey, walking down a street approximately one mile from the crime scene. The men matched the descriptions that had been provided of the robbers, and each was found to have a stolen handgun in his possession. In addition, Sumrall, Landtroop, and Keso positively identified the defendant as the gunman and Winfrey as his accomplice during a showup identification procedure conducted at the BMI Building within an hour of the report of the robbery. The defendant and Winfrey were subsequently charged with one count of aggravated robbery for the robbery of Sumrall; two counts of criminal attempt to commit aggravated robbery for the attempted robberies of Keso and Landtroop; one count of felony possession of a weapon; and one count each of theft over $500 for the theft of their respective weapons.

## Suppression Hearing

Prior to their joint trial, both the defendant and his codefendant filed motions to suppress the results of the victims' pretrial identification. Metro Police Officer Samuel Johnson testified at the September 4, 2001, suppression hearing as follows: He and his partner, Officer Harrell,[1] were patrolling in the general area of the robbery on the evening of November 27, 2000, when a call went out over their radio at approximately 8:00 p.m. alerting them of the armed robbery at the BMI Building and instructing them to be on the lookout for the suspects. The "be on the lookout," or "bolo," described the suspects as two black males, one wearing dark pants and a silver, hooded jacket and the other wearing dark pants and a flannel-type shirt jacket. Approximately twenty minutes later, the officers spotted two men who matched that description walking in the area of Thirteenth Avenue South and Edgehill Avenue. One suspect was found with a .40 caliber pistol and the other with a .38 caliber revolver. A computer check revealed that both weapons had been reported as stolen. The officers arrested the men and immediately transported them to the BMI Building for a showup identification.

Officer Johnson testified the showup occurred within an hour of when the first radioed reports of the robbery went out. He said the defendant and Winfrey were removed from the back of his police car one at a time and made to stand outside the car with a light shined on them while the victims attempted to identify them. Neither he nor Officer Harrell communicated with the victims during the showup. However, another police officer later informed him that all three victims had positively identified both the defendant and his codefendant as the robbers.

On cross-examination, Officer Johnson testified the descriptions provided of the robbers included their race, sex, and clothing. He could not recall if any distinguishing physical characteristics, such as height, weight, or teeth, had been mentioned. He estimated the location at

[1]This officer's name appears as "Harold" in the transcript of the hearing on the motion to suppress, but as "Harrell" in the trial transcript.

which he and Officer Harrell first spotted the defendant and Winfrey was two miles from the crime scene, but stressed he was not sure about the distance and that it was only an approximation. The men were walking at the time the officers spotted them, which was "twenty minutes or so" after the first radioed reports of the robbery went out, did not appear sweaty or out of breath, and did not attempt to run or hide upon the officers' approach. They had no property belonging to the victims in their possession.

Officer Johnson further testified as follows: He and Officer Harrell arrested the defendants at approximately 8:30 p.m. and the showup occurred at 8:35 or 8:40 p.m. The handcuffed defendants were made to stand outside his police vehicle while the headlights of another police vehicle, in which the victims were sitting, were shined on them. The victims were approximately thirty to forty feet from the defendants during the identification procedure. Officer Johnson explained that the defendants were handcuffed for the officers' safety. He conceded, however, that they were the only handcuffed African-American men at the scene.

Metro Police Officer Jonathan Riggs testified he responded to the robbery call at the BMI Building, took a description of the suspects from the victims, and had the descriptions broadcast over the air. He said suspect number one was described as a black male, approximately 5'10", 195 pounds, black hair in braids or "dreads," brown eyes, wearing black jeans and a gray hooded coat. Suspect number two was described as a black male, approximately 5'9" in height, 130s in weight, black hair, wearing blue jeans and a blue and white flannel coat. He testified that after the description of the suspects had been broadcast over the radio, Officers Johnson and Harrell responded that they had two suspects matching that description in custody.

Officer Riggs said he informed the three victims about the two possible suspects and explained the showup procedure to them. He did not tell the victims that the defendants were definitely involved in the robbery. Instead, he informed the victims that he did not know if the men they had in custody had committed the crime and needed the victims to see if they could identify them. To conduct the showup, he placed the two female victims in the back of his patrol car and drove around the BMI Building to where Officer Johnson's patrol car, in which the defendants had been brought to the crime scene, was parked. The defendants were made to stand at the front of Officer Johnson's patrol car for the showup procedure, while the victims remained seated in the rear of Officer Riggs's vehicle, which was parked approximately twenty feet away. After both women had positively identified the defendant and his codefendant, he returned the women to the BMI Building and repeated the same procedure with the male victim, who also made positive identifications of both the defendant and his codefendant. All three victims indicated they were able to see the defendants clearly. On cross-examination, Officer Riggs testified he did not recall Sumrall or Landtroop making any comments about either of the defendants having gold teeth or a speech impediment. He could not recall smelling alcohol on Ms. Sumrall's breath, and nothing indicated she was too intoxicated to participate in a showup procedure.

Bridget Landtroop testified she, Erin Sumrall, and Blair Keso were coworkers at Broadcast Music, Incorporated, located at 10 Music Square East. The robbery occurred at about 8:00 p.m. in

the parking lot of the building, in an area which was well-lit. The robbers did not wear masks, and she had no trouble seeing their faces. The first robber was within an arm's reach of her, while the second man was a little further away. Landtroop said Keso used her cell phone to call 9-1-1 after the robbery, and that the police responded immediately, arriving by the time she and Sumrall had run from the parking lot to the lobby of the building. When the officers arrived, she provided them with a description of the two robbers, telling them that the first robber wore his hair in braids and was dressed in a "big," dark green, football-like parka, blue hooded sweatshirt, dark jeans, and black and white tennis shoes, while the second man was wearing a white and blue plaid flannel shirt and blue jeans.

Landtroop testified the showup occurred "within fifteen, twenty, twenty-five minutes" of when the police officers took her descriptions of the robbers. She said the police officers told them that they had seen some men who might be suspects and asked if they could identify them. The officers then placed her and Sumrall in the back of a police car, drove around the rotunda in front of the BMI Building, and shined the headlights of the car on the suspects, who were standing in front of another police car. Landtroop testified both she and Sumrall identified the defendant and Winfrey as the robbers. She said she identified the men based on a combination of their faces and their clothing, and had no doubt about her identification. Neither she nor Sumrall influenced the other's identification.

On cross-examination, Landtroop testified she, Sumrall, and Keso attended BMI's annual Christmas tree lighting party on the afternoon of the robbery, and then went together to the Hall of Fame Lounge across the street. She said she drank one beer at the BMI reception and one to two additional beers at the lounge, for a total of two to three beers between the hours of 4:00 and 8:00 p.m. Sumrall and Keso had approximately the same amount to drink as she did during that period. Landtroop testified she thought the police officer who described the showup procedure referred to the defendants as "individuals" rather than "suspects." She said the defendants were outside the police car together when she and Sumrall identified them. She testified she and Sumrall both identified the defendants immediately.

Blair Keso testified the police responded within five to ten minutes of his 9-1-1 call. He said he gave the 9-1-1 dispatcher a description of the robbers during the telephone call, and provided another description to the officers who responded to the scene. His memory was that he described them as two black males, one wearing an athletic parka similar to the ones football players wear while on the sidelines, and the other wearing "a plain, perhaps, flannel shirt jacket, meaning a heavier than usual flannel shirt to be worn as a – perhaps a windbreaker." Keso also thought he told the officers that the defendant's jacket was silver-colored and that Winfrey's plaid shirt-jacket was blue. He said, however, that, while certain of the style and shape, he was not sure about the colors of the robbers' clothing.

Keso testified that he described both robbers as being of medium height. He said his identification took place within forty to forty-five minutes of his 9-1-1 call, and occurred while he was seated in the back of a patrol car approximately twenty-five feet from the defendants. He

testified he made a general identification of both defendants based on their clothing, the style and shape of which was "dead on," but he was unable to identify either robber by his face. He explained his attention during the robbery had been primarily focused on the guns that the defendant brandished in a haphazard manner. He testified that neither Sumrall nor Landtroop were with him at the time he identified the defendant and Winfrey, and that he did not discuss his identifications with them prior to the showup procedure.

Keso further testified that the two weapons used in the robbery were clip-loading, automatic pistols rather than revolvers. He said he recalled one of the weapons being chrome-plated. He was shown the weapons which were found on the defendants, but they were not the same weapons he recalled from the robbery. On cross-examination, Keso testified that "medium height" is anywhere from 5'9" to six feet. He said he had two bourbon and sodas to drink the night of the robbery and thought the women each had two beers. He testified that the defendant's parka was hooded, as was the sweatshirt he was wearing beneath his parka. He said Winfrey had no weapons and said nothing during the robbery.

**Trial**

The State's first witness at trial was Erin Sumrall, who testified as follows: She attended BMI's annual Christmas tree lighting party which began at 4:00 p.m. on November 27, 2000, where she drank one glass of wine and ate a variety of "finger foods." When she left that event, she accompanied her coworkers, Blair Keso and Bridget Landtroop, across the street to the Hall of Fame or Music City Lounge where she drank two beers. She said she was not drunk at the time of the robbery.

Sometime after 7:30 p.m. she, Keso, and Landtroop left the lounge together and began walking back to the BMI Building where their vehicles were parked. As they were walking, Keso began hurrying her and Landtroop across the street. At that point, Sumrall did not know what was happening. At the BMI parking lot, however, she heard someone come up behind her, saying, "[H]ey, hey, hey." When she turned around, she saw two African-American men, one of whom held two guns pointed at her head as he demanded her purse, saying, "Drop the purse." She hesitated and the gunman said, " Drop the purse, Bitch. I mean it. I'm not kidding." The gunman also yelled at his companion to "get" Landtroop, who was walking ahead of Sumrall. However, the second man "just stood there." Next, the gunman grabbed Sumrall's purse, which she had by that time set on the ground, and both men ran off together toward the park.

Sumrall testified the contents of her purse included approximately $15 in cash, a cell phone, credit cards, and jewelry. She said the area where the robbery took place was well-lit, and she got a good look at both robbers' faces. Immediately after the robbery, Keso took Landtroop's cell phone to call 9-1-1 and instructed Sumrall and Landtroop to run to the BMI lobby to get the security guard. The security guard called 9-1-1 also, and Sumrall spoke to the 9-1-1 operator as well. Sumrall identified her voice on the 9-1-1 tape, and the portion of the tape containing her conversation with the 9-1-1 operator was played before the jury. At a later point in the State's case in chief, Landtroop

and Keso each identified their respective voices on the tape as well, and the entire 9-1-1 tape was ultimately admitted as an exhibit in the case.

Sumrall testified police officers arrived within five minutes of the 9-1-1 call, and she, Landtroop, and Blair gave them descriptions of the robbers. She said that thirty to forty-five minutes later, the police officers told them they had apprehended two people that they wanted them to look at. The officers put her and Landtroop in the back of a patrol car, drove out to the street, pulled two men out of a different car, and asked if she and Landtroop recognized them. Sumrall said the headlights of their vehicle were shining on the defendant and Winfrey, and she had no difficulty in recognizing them as the men who had robbed her. She stated that the showup occurred within an hour of the robbery, and that no one influenced her identification. Sumrall testified that the robber with the guns, whom she identified as the defendant in court, wore a dark, hooded jacket with a red lining. She said the other one, whom she identified in court as Winfrey, wore a plaid, flannel hunting-type shirt that was blue and light tan or off-white and had "piecey hair."

On cross-examination, Sumrall acknowledged the first 9-1-1 call was made at 7:59 p.m. She conceded the 9-1-1 operator she spoke to suggested to her what the robbers were wearing, having obtained the information from the other 9-1-1 call. She did not remember if the guns used in the robbery were shiny. The only robber who spoke to her was the one with the guns. She later recovered her purse and informed the police that it had been found. However, because of the number of people who had handled the purse and the length of time that had transpired since the robbery, the police made no attempts to lift any fingerprints from it. Sumrall acknowledged none of her property was found on the defendants' persons when they were arrested. She said she described the robbers as between 5'9" and six feet tall, and she had recognized the defendant, in part, by his jacket and goatee, but she had not noticed his gold teeth. She testified she also had gotten a good look at Winfrey and had described him as "lean" with a "very young looking baby face."

On redirect, Sumrall reiterated her certainty that the defendant and Winfrey were the men who robbed her. She said her identifications were based on "[e]verything. Everything together. Their faces, their clothing, every–everything. And you know when you've been robbed by somebody, and you see them an hour later, you know it was them." She was adamant that neither her descriptions of the robbers nor her subsequent identifications were influenced by anyone. She also said she would have told the police, had they brought the wrong men, because it would have meant that "the people who had actually done it were still out there."

Sumrall further testified she recovered her purse in the area near Edgehill and Twelfth Avenue sometime in the week following the preliminary hearing. She explained that a woman in that neighborhood found her keys on her windowsill, called the Kroger telephone number on the Kroger card that was with her keys, was given her telephone number, and then left a message on her answering machine. Sumrall said when she and Landtroop went to the housing development where the woman lived, another resident of the complex showed them a dumpster where the resident had earlier seen a purse. Inside the dumpster, Landtroop found a number of items that had been in Sumrall's purse, including Sumrall's brushes, pins, makeup bag, and empty jewelry bag. As they

were looking through the dumpster, a male resident of the complex approached, told them he had found a black purse at the dumpster, and then retrieved it for them from his apartment. Sumrall testified that the purse was hers and that it contained her wallet with all her credit cards and identification. However, all the "little pieces of paper" she had accumulated were missing, and what remained had been "stuffed in one compartment."

Much of Bridget Landtroop's trial testimony mirrored the testimony she provided at the suppression hearing. In addition, she testified that as she, Keso, and Sumrall were rounding the corner during their walk from the lounge to the BMI parking lot, Keso saw two men further down the street and ushered her and Sumrall across the street. As they reached the parking lot, a man with two guns came running toward them, pointed his guns at them, and said, using expletives which Landtroop could not recall, "[H]ey, hey, hey, give me your purses, give me your money. I mean it." One of the guns was shiny and chrome, and the other was dark-colored. The gunman was accompanied by another man who did not speak and had no guns.

Landtroop testified that when the gunman approached her, she "kind of gave him a hand and kept walking." She later clarified what she meant by that statement, testifying that she was from Chicago, had been taught not to make eye contact with people, and had reacted with hostility upon the gunman's approach by putting her hand up and waving him off. She testified that when she continued walking, the gunman yelled at his companion to "go get her, go get her," but the second man "just stood there." Next, she heard Keso call her name, turned around, and saw Sumrall placing her purse on the ground and Keso standing a couple of feet behind Sumrall. At that point, Landtroop ran back to Keso, gave him her cell phone to call 9-1-1, grabbed Sumrall, and ran to the lobby of the BMI Building. Before she left the scene, she saw both robbers running toward the park across from the BMI Building.

Landtroop made positive courtroom identifications of the defendant as the gunman and Winfrey as his accomplice. She said the parking lot in which the robbery occurred was very well-lit, and she had an unobstructed view of both robbers, with the exception of Winfrey's feet which were hidden by a short retaining wall. The defendant was wearing an olive green, zippered jacket with a red lining, a dark, hooded sweatshirt, dark jeans, dark shoes, and a "dew rag," similar to a bandana, with braids hanging down. Winfrey was wearing a blue flannel shirt and blue jeans and had a "baby face." She did not discuss her descriptions with anyone before giving them to the police, and did not discuss her identification of the defendant and Winfrey before informing the officer conducting the showup that the men were the robbers.

On cross-examination, Landtroop testified she had no memory of the descriptions of the robbers she had given to the 9-1-1 operator. Nonetheless, she acknowledged the tape recording of the 9-1-1 call revealed she had described the defendant as about 5'9" and wearing blue jeans, and that she had said that she did not see the second man. However, she explained she had used the term "blue jeans" as a generic term meaning denim material, and she had been panicked and in shock at the time she made the 9-1-1 call. Moreover, she insisted she recalled having seen Winfrey "standing there" during the robbery.

Blair Keso testified that, as he was accompanying Landtroop and Sumrall to the BMI parking lot, he noticed two figures emerge from the park about seventy-five yards ahead and begin walking toward them. Having the feeling that the two individuals were "up to . . . no good," he ushered the women to the other side of the street and quickened the pace. By the time they reached the parking lot, however, it became apparent that the two individuals were running toward them. Keso said he heard someone say, "[Y]o, yo, yo," turned to the left, and saw two men, one of whom held a handgun in each hand with both guns pointed at them. The gunman directed Sumrall to hand over her purse, and she either handed it to him or placed it on the ground, while Landtroop kept walking. Keso testified he took one step forward and reached behind his back for his wallet. He said he believed the gunman interpreted the gesture as a threat, because at that point he ordered Keso to "back the fuck up, bitch." Keso testified the robbers left on foot, running across the edge of the park and a cul-de-sac before disappearing into the adjoining neighborhood.

Keso described the showup procedure employed at the crime scene and his identification of the defendant as the gunman and Winfrey as his accomplice based on their clothing. He said the parking lot was well-lit and he had no difficulty in recognizing the men by their clothes, but he was unable to recognize them by their faces. Keso also testified that the guns found on the defendants did not appear to him to be the same weapons he had observed during the robbery. He said the guns used in the robbery were both small, clip-loading, semi-automatic handguns, and one appeared to be chrome-plated. The guns found on the defendants were both dark, gun-metal blue, with one being a "standard issue" .32 or .38 caliber revolver, and the other a large, semi-automatic, clip-loading gun. However, on cross-examination, Keso testified he could not be certain the guns found on the defendants were not the same weapons that had been used in the robbery.

Officer Jonathan Riggs testified at trial and essentially repeated his suppression hearing testimony about his role in the robbery investigation, including his participation in the showup identification. He said he had no concerns about any of the victims being under the influence of alcohol at the time they provided their descriptions of the suspects or identified the defendants as the robbers. He testified the three victims were together at the time he took their statements, and he believed the two women spoke to each other during the identification procedure, but he could not recall any specifics about their conversation.

Officer Samuel Johnson testified he and Officer Harrell received the report of the robbery at about 8:00 p.m. and immediately began canvassing the neighborhood for the suspects, who were described as "black males, dark clothing, one had a dark colored, hooded jacket, and the other had a flannel shirt/coat, a heavy flannel shirt, coat, and dark clothing, dark jeans." Twenty to thirty minutes later, they spotted the defendants, who matched the bolo's description, "in the area of Thirteenth Avenue South, between Treemont and Edgehill." Officer Johnson testified he had driven the distance between that site and the scene of the robbery that morning before his appearance at trial, and found that it was slightly less than a mile by the shortest street route. He said the distance would be shorter if one took a direct path by foot through yards.

Officer Johnson testified that Winfrey had a loaded .38 caliber revolver in one of his pants pockets, and the defendant had a loaded .40 caliber semi-automatic pistol in his front coat pocket. Both weapons had been reported as stolen. At the time of his arrest, the defendant was wearing dark pants which were possibly dark blue jeans, a silver hooded jacket, and possibly a black "dew rag." Winfrey was wearing dark pants, which were possibly jeans, a flannel shirt/coat, a "dew rag," and black gloves. Officer Johnson testified he did not notice anything about the defendant's teeth. On cross-examination, Officer Johnson testified the defendants were walking toward town when he spotted them, and neither was sweaty or out of breath. He stated there was nothing odd or unusual about the defendants' clothing.

Ronald Allen and Marty Joe King, the owners of the weapons found on the defendants, each identified his respective weapon and testified about how it had been stolen.

Detective Jeff Ball of the Metro Police Department's Robbery Unit testified he and Detective Todd Harrison spoke with the defendant and Winfrey at the robbery office on the night of the robbery. He described the defendants' appearance at the time:

> [The defendant] was wearing dark colored pants, a puffy type winter jacket. It was dark colored with a red lining, had on a black shirt that had white stripes on the sleeves and white on the chest. His hair was . . . in braids, even though he had a black rag tied around the top of his head. Mr. Winfrey had on a brown and white plaid heavy shirt, long sleeved shirt. He, also, had a rag around the top of his head and had on dark colored pants.

Detective Ball identified two photographs taken of the defendants on the night of their arrests, which were subsequently admitted as exhibits in the case. He said he did not recall anything unusual about either defendant's mouth.

During cross-examination, each defense counsel asked Detective Ball to measure the height of counsel's respective client. After taking the measurements, Detective Ball testified that the defendant was "[a]bout six foot four and a half" and that Winfrey was "six feet and a half of an inch." He said the defendant's demeanor was normal at the time he spoke to him on the night of the robbery. He further testified he was present when Detective Harrison offered an inducement to the defendant to make a statement about the case.

**Defense Proof**

The defendant's first witness was his girlfriend, LaDonna Higgins. Higgins testified she lived at 821 Edgehill Avenue at the time of the robbery, and that the defendant occasionally stayed with her. She said that on November 27, 2000, she returned home from work at 3:45 or 4:00 p.m. to find the defendant and Winfrey in her apartment. At some point that evening, the defendant and Winfrey left in her cousin's car to pick up her children from daycare. They returned at 7:10 or 7:15

p.m. and watched television with her in the apartment until 8:00 or 8:15 p.m., when they both left together. She was certain about the time because the television program "The Hughley's," which came on at 8:00 p.m., was playing when they left. Higgins testified that Detective Harrison called her at 9:00 or 10:00 that evening wanting to know what time the defendant had left her apartment, and that she had told him she did not know. She also acknowledged having told him that the defendant had left alone. She explained she had lied because Detective Harrison had not identified himself as a police officer and she had not wanted to give out accurate personal information about the defendant to a stranger. She testified that the defendant has three or four permanent gold teeth.

William Zuckerman, the program director for Fox Channel 17 and WXP Channel 30, testified that on November 27, 2000, "The Hughley's" aired at 8:00 p.m.

Katherine Bay Bumpas, a paralegal employed by the defendant's counsel, testified she had measured by car odometer the distance from 821 Edgehill, the defendant's girlfriend's residence, to the intersection of Twelfth and Edgehill and found it to be three-tenths of a mile. On cross-examination, she conceded she was unfamiliar with the neighborhood and therefore unable to testify as to the distance between those points if one traveled by foot through backyards rather than along the streets.

The defendant elected not to testify and rested his case without presenting any further witnesses.

Winfrey's first witness was his mother, Martha McKinney. She testified Winfrey telephoned her from Higgins' apartment at 8:00 p.m. on November 27, 2000, and her conversation with him lasted five or ten minutes. She was certain of the time because she glanced at her clock on her way to answer the telephone. On cross-examination, she conceded her information regarding Winfrey's whereabouts at the time he made the phone call was based solely on what he told her.

The defendant's codefendant, Richard Winfrey, who apparently has a speech impediment, testified with the assistance of the court officer, who read aloud his written answers to counsel's questions. Winfrey testified he was at Higgins' apartment on November 26 and 27, 2000. On November 27, he and the defendant left the apartment at 5:30 or 5:45 p.m. to pick up Higgins' children from daycare. They returned to her apartment and watched various television programs, including "The Hughley's," which came on at 8:00 p.m. Winfrey said he also telephoned his mother around 8:00 p.m. from Higgins' home, and he spoke with her for eight to ten minutes. Afterwards, he and the defendant left Higgins' apartment to go buy some marijuana. On their way, they were stopped and arrested by police officers who accused them of being involved in a robbery. Winfrey testified he obeyed the officers' instructions to lie on the ground and informed them he had a weapon. He explained he was armed that night for self-protection because he was walking in a bad neighborhood. He said he was unfamiliar with the area, did not know where the BMI Building was located, and did not know the victims. He denied he had robbed anyone on the night of November 27, 2000.

On cross-examination, Winfrey testified he was 18 years old at the time of the robbery. He acknowledged he and the defendant were very good friends and did many things together. He said neither he nor the defendant had a regular job at the time of the robbery, but he was scheduled to start a Job Corps program and the defendant occasionally cut people's hair. Winfrey acknowledged he had been to Higgins' home several times, but nonetheless maintained he was unfamiliar with the neighborhood. On redirect, he testified he was taller than six feet, weighed 210 or 220 pounds, and had not weighed 130 since he was 11 or 12 years old.

After deliberating, the jury found the defendant guilty of one count of aggravated robbery, a Class B felony; one count of attempted aggravated robbery, a Class C felony; and one count of felony possession of a weapon, a Class E felony. The jury found the defendant not guilty of the theft count of the indictment and was unable to reach a verdict with respect to count three, which charged him with the attempted aggravated robbery of Keso. The jury found Winfrey guilty of the lesser offense of possession of a weapon with the intent to go armed, a misdemeanor, and not guilty of the remaining counts of the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his robbery convictions, implicitly arguing that the evidence was insufficient to establish his identity as one of the perpetrators in the case.[2] In support, he cites the various discrepancies in the victims' descriptions of the robbers; the differences between their descriptions of the guns used in the robbery and the weapons found on himself and Winfrey; and the fact that Sumrall's stolen purse was found several days after the robbery at a time when both he and Winfrey were in jail. In addition, he asserts that the jury's verdict finding him guilty of the robbery offenses and his codefendant not guilty was inconsistent with both the State's theory that he and Winfrey perpetrated the crime together and with the defense theory that they were together elsewhere at the time the robbery occurred.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the

---

[2]Although the defendant broadly frames this issue as "whether the evidence was sufficient to support the verdict," it is clear from his argument that he is contesting only his convictions for aggravated robbery and attempted aggravated robbery.

credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude there was more than sufficient evidence in this case to establish the defendant's identity as the armed robber. The defendant and Winfrey matched the descriptions of the robbers that the victims provided to police, and were discovered twenty to thirty minutes after the robbery walking in an area nine-tenths of a mile from the BMI Building if one traveled by street, but less if one traveled a direct route by foot. All three victims identified the defendant as the gunman during the showup identification conducted within an hour of the robbery, with Landtroop and Sumrall identifying him by the combination of his face and clothing and Keso by his clothing alone, which he said was "dead on." In addition, both Sumrall and Landtroop positively and unequivocally identified the defendant in court. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

Moreover, we agree with the State that the fact that Sumrall's purse was recovered after the defendant and Winfrey were both in jail does not undermine the proof that the defendant was the robber who took her purse at gunpoint. We further agree that, based on the evidence, it was within the jury's province to acquit Winfrey of the crimes while at the same time resolve the various discrepancies in the victims' descriptions of the robbers and the handguns used in the robbery in favor of the State, as evidenced by its verdicts finding the defendant guilty of the aggravated robbery of Sumrall and attempted aggravated robbery of Landtroop. We, therefore, conclude the evidence was sufficient to support the defendant's convictions.

## II. Pretrial Identification

As his next issue, the defendant contends the trial court erred in denying his motion to suppress the results of the victims' pretrial identifications. In State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996), our supreme court clarified the standard of review to be applied to trial court rulings on suppression issues:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So

long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of facts in a suppression hearing will be upheld unless the evidence preponderates otherwise. We also note that this standard of review is consistent with Tenn. R. App. P. 13(d), which provides that in civil cases, findings of fact by a trial court are presumed correct "unless the preponderance of the evidence is otherwise." Hereafter, the proper standard to be applied in reviewing suppression issues is the "preponderance of the evidence" standard.

"The application of the law to the facts found by the trial court, however, is a question of law which this Court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Additionally, evidence introduced both at trial and at the suppression hearing may be considered when evaluating a trial court's ruling on a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The defendant argues that the pretrial identification procedure, in which he and Winfrey were pulled from a police car at night in handcuffs and made to stand together at the crime scene while headlights were shined on them, was inherently suggestive and violated his due process rights under both the United States and Tennessee Constitutions to fundamental fairness in a criminal proceeding. In addition, he asserts the showup procedure was an adversarial proceeding that triggered his right to counsel under the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive; and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). Since "reliability is the linchpin in determining the admissibility of identification testimony," Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140 (1977), the central question is "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972) (interior quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it"). If an identification procedure is found to have violated a defendant's right to due process by being so impermissibly suggestive as to have given rise to a substantial danger of misidentification, both the out-of-court and in-court identifications must be excluded at trial. See State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and

the confrontation.  See Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382.  The corrupting effect of the suggestive procedure is weighed against these factors.  See  Manson, 432 U.S. at 114, 97 S. Ct. at 2253; see also Strickland, 885 S.W.2d at 88 ("The degree of reliability of the identification, as indicated by [the Biggers] factors, should be assessed in light of the suggestiveness of the identification procedure . . . .").

Showup identification procedures have long been considered to be "inherently suggestive and unfair to the accused."  State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989).  For this reason, Tennessee courts have repeatedly condemned the use of showups as a means of establishing the identity of an individual suspected of committing a crime, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime."  Id. (citations omitted).  As for imperative circumstances, the United States Supreme Court has identified not only circumstances such as the possible death of the witness/victim, but also circumstances such as when a serious felony has been committed, the perpetrators are still at large, and law enforcement officials need to quickly determine if they are "on the right track" with the suspects they have uncovered.  Simmons, 390 U.S. at 384-85, 88 S. Ct. at 971.

The showup procedure in this case was inherently suggestive because the defendants were pulled from the back of a police car in handcuffs and made to stand in the glare of a police car's headlights at the crime scene. The practice of presenting a handcuffed suspect in a one-on-one confrontation has been condemned.  See, e.g., Webb v. Havener, 549 F.2d 1081 (6th Cir. 1977); State v. Beal, 614 S.W.2d 77, 81-82 (Tenn. Crim. App. 1981) (describing such practices as "creating a substantial likelihood of misidentification and are thus to be shunned unless absolutely unavoidable").  However, we conclude, as did the trial court, that the showup was not impermissibly suggestive so as to give rise to a substantial likelihood of misidentification.  According to the testimony of all the witnesses, the identification took place within an hour of the crime, at a time when the victims were still on the scene and the officers were in their initial phases of their response to the robbery report.  Thus, the showup was conducted as part of an on-the-scene investigatory procedure shortly after the crime.  In addition, a serious felony had been committed, the armed perpetrators were still at large, and the police needed to know immediately if the suspects they had captured were the right men, or if they needed to continue canvassing the area.

Furthermore, an analysis of the Biggers factors supports the conclusion that a substantial danger of misidentification did not exist in this case.  First, all three victims testified that the area in which the robbery occurred was well-lit, neither robber wore a mask, and they had the opportunity to clearly view the robbers.  Second, the victims' detailed descriptions of the robbers' clothing, hairstyle, and actions reveal a high degree of attention paid by the victims to their assailants.  Third, although there were some discrepancies in the victims' descriptions of the robbers, and none of the victims accurately estimated or reported the defendant's height, their descriptions for the most part comported with the appearance the defendant and Winfrey presented at the time of their arrests.  Fourth, all three victims positively identified the defendant and Winfrey as the robbers without any hesitation or uncertainty.  Finally, the identifications occurred within an hour of the robbery, when

the episode was fresh in the minds of the victims. Thus, all five factors support the reliability and accuracy of the identification.

The defendant also contends the trial court should have suppressed the results of the showup on the basis that it was an adversarial proceeding that triggered his right to counsel. In support, he cites State v. Burns, 777 S.W.2d 355 (Tenn. Crim. App. 1989), in which this court noted that the rationale for the presence of counsel during a line-up identification is to "deter any misuse of the process and secure for the defendant a means of reconstructing for the court's review any unfairness in the procedure actually implemented." Id. at 358 (citing United States. v. Thevis, 655 F.2d 616, 642 (5th Cir. 1982). However, we agree with the State that the defendant's reliance on Burns is misplaced. The defendant in Burns had already been taken to the police station and was in the process of being booked at the time an officer, who had been called to the jail to participate in a lineup, inadvertently saw him standing in the booking area and identified him as the passenger he had seen run from a truck that left the scene of a burglary. Id. Here, by contrast, the identification occurred immediately after the defendant's arrest, within an hour of the crime, before the defendant had been taken to the police station.

A defendant's right to counsel attaches at all "'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'" Maine v. Moulton, 474 U.S. 159, 170, 106 S. Ct. 477, 484, 88 L. Ed. 2d 481 (1985) (quoting United States v. Wade, 388 U.S. 218, 224, 87 S. Ct. 1926, 1931, 18 L. Ed. 2d 1149 (1967)); State v. Mitchell, 593 S.W.2d 280, 287 (Tenn. 1980). The Mitchell court established when the right to counsel attaches in Tennessee:

> We hold that right to counsel attaches when adversary judicial proceedings are initiated. Initiation is marked by formal charge, which we construe to be an arrest warrant, or at the time of the preliminary hearing in those rare cases where a preliminary hearing is not preceded by an arrest warrant, or by indictment or presentment when the charge is initiated by the Grand Jury.

Id. at 286 (footnote omitted). Because no formal charges had yet been filed against the defendant in this case, his right to counsel had not been triggered at the time the showup was conducted. Thus, the showup conducted without the presence of his counsel did not violate either his right to counsel under the Sixth Amendment of the United States Constitution or his corresponding right under the Tennessee Constitution.

In its written order denying the defendant's motion to suppress the evidence, the trial court stated in pertinent part:

> The Court is of the opinion that the showup in this case was not impermissibly suggestive. The showup was conducted very shortly after the alleged robbery and conducted in a way as to provide

safety to the officers and victims. There were no improper suggestions made by the authorities. Looking at the totality of the circumstances, the Court is of the opinion that the authorities conducted the showup in an acceptable manner. In addition, defendant Winfrey contends that the showup violated his Sixth Amendment right to counsel. The Court is of the opinion that the right to counsel had not attached at the time of this showup, which took place very shortly after the incident and before any formal charges had been placed on the defendant. The Court acknowledges that in this case the testimony revealed some inconsistencies between the witnesses' testimony as to the descriptions of the suspects, clothing of the suspects, and the weapons used, but that these questions are more jury issues going to the weight of the evidence to be presented at trial, rather than their admissibility.

The evidence does not preponderate against the trial court's findings. We conclude, therefore, that the trial court did not err in admitting the results of the victims' pretrial identification.

### III. Consecutive Sentencing

Next, the defendant challenges the trial court's imposition of consecutive sentencing for his robbery convictions. He argues the trial court erred by basing consecutive sentencing on the fact that he was on probation at the time of the robbery because the offense for which he was on probation was a misdemeanor. In support of this contention, he notes that Tennessee Code Annotated section 40-35-114(14) allows for the enhancement of a sentence if the crime at issue was committed while the defendant was on probation for a prior felony, rather than a misdemeanor. The State responds by arguing that the defendant has waived the issue by failing to include the certified copies of his prior convictions, upon which the trial court relied in sentencing, in the record on appeal. The State additionally argues that the plain language of the statute governing consecutive sentencing contains no requirement that a defendant have been on probation for a felony at the time he committed the offense for which he is being sentenced. We agree with the State.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

Although the transcript of the sentencing hearing is included in the record on appeal, the certified copy of the defendant's convictions, which was admitted as an exhibit at the sentencing hearing, is not. It is the defendant's duty to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(b). When necessary parts of the record are not included on appeal, we must presume that the trial court's ruling was correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Therefore, we agree with the State that the defendant has waived this issue for appellate review. Regardless of the waiver, the defendant would not be entitled to relief on this issue.

The trial court based its imposition of consecutive sentencing on the fact that the defendant was on probation, apparently from a misdemeanor offense, at the time of the robbery. Tennessee Code Annotated section 40-35-115(b), which governs consecutive sentencing, provides that a trial court may, in its discretion, impose consecutive sentencing based on a finding that the defendant meets any one of seven different criteria by a preponderance of the evidence. These criteria include the following: "The defendant is sentenced for an offense committed while on probation[.]" See id. § 40-35-115(b)(6). The State is correct in noting there is no requirement that the defendant have been on probation from a felony at the time he committed the instant offenses. See, e.g., State v. Parker Odell Doney, Jr., No. M2001-01187-CCA-R3-CD, 2002 WL 65994, at *9 (Tenn. Crim. App. Jan. 17, 2002) (concluding that trial court's finding that defendant committed offenses while on probation for misdemeanor assault was "alone . . . sufficient to justify consecutive sentencing"). The aggregate sentence of fourteen years in this case was appropriate, due to the serious nature of the defendant's offenses. We conclude, therefore, that the trial court committed no error in sentencing the defendant.

## IV. Exclusion of Defendant's Statement to Police

As his final issue, the defendant contends the trial court erred in granting the State's motion in limine to exclude any of his self-serving statements. He argues the trial court's ruling "severely limited the [defendant's] ability to testify on his own behalf" because it prohibited him from using the prior consistent statement to bolster his own testimony. The State argues, *inter alia*, that the trial court correctly relied on established law in ruling that the defendant would not be allowed to introduce any self-serving statements without first taking the stand to testify in his own behalf. Again, we agree with the State.

Generally, a defendant may not introduce self-serving statements without testifying. See State v. King, 694 S.W.2d 941, 945 (Tenn. 1985); State v. Belser, 945 S.W.2d 776, 784 (Tenn. Crim. App. 1996); State v. Wiseman, 643 S.W.2d 354, 366 (Tenn. Crim. App. 1982). Wharton's Criminal Evidence, which the trial court cited in its ruling on this issue, offers the rationale for this rule:

> A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense. A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness.

> If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

2 Charles E. Torcia, Wharton's Criminal Evidence, § 294 (14th ed. 1986) (footnotes omitted). Thus, the trial court correctly ruled that the defendant would not be allowed to introduce his self-serving statements at trial through the testimony of a police officer, as he sought, without the defendant's taking the stand in his own behalf. We note that, contrary to the defendant's implied assertion, the trial court's ruling did not include a blanket prohibition against the defendant's introduction of the statement as a means of bolstering his credibility, provided he first testified and such bolstering became necessary. See generally, Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[9] (4th ed. 2000) (stating that witness's prior consistent statement may be admissible to rehabilitate a witness whose credibility has been attacked). To the contrary, when the defendant sought to make an offer of proof of his statement, the trial court refused on the basis that it need not address the issue until the defendant testified. The trial court stated:

> In other words, after [the defendants have] testified, depending on what develops later in the day with your clients, if they do intend to testify, then you could recall these witnesses, or whatever you're – I'm not saying, you know, that you would have to call your client as a witness. That's your decision and his – his, primarily, but I – I think that most of the case law that I don't think has been overturned, says that until he testifies, particularly, Hall [v. State, 552 S.W.2d 417 (Tenn. Crim. App. 1977)] says that, in that case, the defendant could have testified, but he chose not to. And that it was settled law.

We conclude, therefore, that the trial court's ruling on this issue was correct.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE